

FILED

MAY 17 2006

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

In re                                    )        Case No.  04-11065-B-11
                                         )
Waterman Industries, Inc.,               )        DC No. WLG-145
                                         )        DC No. MTH-1
                Debtor.                   )
                                         )

**MEMORANDUM DECISION RE OBJECTION TO ADMINISTRATIVE CLAIM
OF CELTIC LEASING AND COUNTER-MOTION FOR PAYMENT OF
ADMINISTRATIVE CLAIM**

Riley C. Walter, Esq., of Walter Law Group, appeared on behalf of the debtor in possession, Waterman Industries, Inc. (the "Debtor").

Michael T. Hertz, Esq., of Lang, Ritchert & Patch, appeared on behalf of respondent to counter-movant Celtic Leasing Corp., ("Celtic").

Donald W. Fitzgerald, Esq., of Felderstein Fitzgerald Willoughby & Pascuzzi, LLP, appeared telephonically on behalf of the Official Committee of Unsecured Creditors (the "Committee").

Randy Rogers, Esq., of Winston & Strawn LLP, appeared on behalf of secured creditor Galena National Investments LLC, ("Galena").

The Debtor objects to an Administrative Expense Proof of Claim filed by Celtic (the "Celtic Claim"). Celtic responded to the objection with a counter-motion to allow and pay the Celtic Claim as an administrative expense. The parties dispute both the administrative priority and the amount of the Celtic Claim. After oral argument, the court took the matter under submission to decide the administrative priority issue, *i.e.*, whether the contracts between Celtic and the Debtor constitute a true lease of personal property, or a non-lease financing agreement disguised as a lease. The outcome of that issue will determine whether Celtic is entitled to have its claim paid, in whole or in part, as an administrative expense pursuant to sections 365(d)(10) and 503(b) of the Bankruptcy Code.[1] Celtic also asserts a claim for alleged conversion of the leased equipment. For

---

[1] Unless otherwise indicated or made clear from the context, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. § 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, as enacted and promulgated prior to the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, Apr. 20, 2005, 119 Stat. 23.

2822

the reasons set forth below, the court finds and concludes that Celtic is entitled to an administrative claim under § 365(d)(10) for the lease payments that came due before the lease was rejected. Celtic is also entitled to an administrative claim for the post-rejection possession and use of the leased equipment in an amount to be determined pursuant to § 503(b). Liquidation of the § 503(b) claim, and allowance of Celtic's conversion claim, if any, will require a further evidentiary hearing.

This Memorandum Decision contains findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52. The bankruptcy court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 11 U.S.C. §§ 365 and 503. This is a core proceeding pursuant to 28 U.S.C. 157(b)(1)(B).

**Findings of Fact**

Debtor manufactures water control equipment and has been in business since 1912. Debtor's products are sold worldwide. They include control gates, valves, and related equipment serving the irrigation and water control needs of the agriculture and wastewater treatment industries. Debtor's manufacturing and business operations are dependant upon computers and computer software.

In 1996, Debtor and Celtic entered into an agreement entitled "Master Lease Celtic Leasing Corp. - Lessor" (the "Master Lease"). In November 2001, Debtor signed Schedules 2 and 3 (collectively, the "Schedules"), which added computer hardware and software (the "Equipment") to the Master Lease. Also in November 2001, Celtic filed two UCC-1 Statements in connection with the Equipment, which stated "this filing is for precautionary purposes in connection with a leasing transaction and is not to be construed as indicating that the transaction is other than a true lease." On December 7, 2001, and February 6, 2002, the Debtor entered into agreements to assign lease payments related to Schedules 2 and 3 respectively, to Wells Fargo Equipment Finance, Inc., for the Base Term of the Schedules. Those agreements were both entitled "Assignment of Lease" (the "Wells Fargo Assignments").

2

Debtor filed this chapter 11 case on February 10, 2004. Debtor's Chief Restructuring Officer, Kenneth Leddon ("Leddon") signed the Debtor's bankruptcy schedules as an authorized representative. Bankruptcy Schedule G states that the Debtor was obligated to Celtic under a lease or executory contract in "Computer Equipment." After the Debtor filed bankruptcy, it continued to use the Equipment. On June 23, 2004, more than 60 days after the commencement of the case, Debtor exercised its right to extend the Master Lease and the Schedules for one year from April 1, 2005, through April 1, 2006, (the "2005 Extension"). The Master Lease, the Schedules, and the 2005 Extension are hereinafter collectively referred to as the "Lease" or the "Celtic Lease."

The Lease was apparently extended at least twice between the expiration of the Base Term and the 2005 Extension. In a cover letter to the 2005 Extension, Leddon confirmed the Debtor's intent to extend the Master Lease and the Schedules for one more year:

> As you know, the original term of this agreement has been extended by amendment to April 1, 2005. Therefore, the additional year term would extend the agreement to April 1, 2006 at which time the equipment will either be purchased by Waterman or returned.

The Master Lease defines the nature and scope of the agreement:

> This is a MASTER LEASE AGREEMENT (herein called "Lease"). Lessor hereby agrees to lease to Lessee, and Lessee hereby agrees to lease from Lessor, the items of personal property (collectively called "Equipment" and individually called an "Item") described in any Lease Schedule(s) ("Schedule") now or in the future annexed hereto and made a part hereof, subject to the terms and conditions set forth herein.

The Master Lease gives the Debtor the right of possession and quiet enjoyment for the leased property:

> 1. QUIET ENJOYMENT: So long as Lessee is not in default hereunder, Lessor shall not disturb Lessee's quiet enjoyment of the Equipment subject to the terms and conditions of this Lease.

The Master Lease provides for termination at the end of the "Base Term" as follows:

> 4. TERM: This Lease with respect to any Schedule may be terminated as of the last day of the Base Term by either party giving the other party at least six months but not more than twelve months prior written notice of such termination.

3

The Master Lease further provides that Celtic shall retain title to the leased property, including the software licenses:

> 7. TITLE; PERSONAL PROPERTY:  Except as otherwise provided in this Lease or any Schedule hereto, title to the Equipment shall at all times remain in Lessor. In the event that any of the Equipment is software governed by a software license, Lessee shall keep said license current for the entire lease term and, to the extent the license allows title to the software to pass to licensee, such title shall vest and remain in Lessor.  To the extent that such vesting requires a written conveyance from Lessee, Lessee hereby conveys to Lessor any title it has or may hereafter acquire in the software and foregoes any future claim to the software including any right to purchase and/or use the software beyond the lease term except as otherwise provided in this Lease or the related Schedule.  If the software license restricts any provision of this Lease without the licensor's consent, then Lessee shall assist Lessor, if so requested, in obtaining such consent.

The Master Lease contains a "purchase or renewal" option, which may be exercised at the end of the Base Term:

> 20.  FAIR MARKET VALUE PURCHASE OR RENEWAL OPTION:  Lessee may purchase or renew this Lease for all but not less than all of the Equipment subject to any Schedule as of the expiration of the Base Term or any Extension Term at its then fair market value, as mutually agreed by Lessee and Lessor . . . . In the event Lessee and Lessor cannot agree on a fair market value, then the fair market value shall be determined by the average appraisal of three appraisers . . . .

The Schedules both modified the "purchase or renewal" option to fix a time for giving notice of Debtor's election and a fair market value in the event of a purchase.  The Schedules each state:

> Lessee has irrevocably elected to exercise its option to purchase or renew the above referenced Lease with respect to the above referenced Schedule as of the expiration of the Base Term of said Schedule at its then fair market value ("FMV").  At lease six months prior to the expiration of the Base Term, Lessee shall provide Lessor with written notice of its decision to: (a) purchase the subject Equipment; or (b) renew the Schedule.  Lessee and Lessor hereby mutually agree that: (I) if Lessee chooses (a), above, then the FMV purchase price shall be 36.8% of the total Equipment cost, which cost includes all related disbursements made by Lessor or its Assignee; and (ii) if Lessee chooses (b), above, then the FMV renewal of the Schedule shall consist of a one year extension at the rental amount in effect as of the last billing cycle of the Base Term. . . .

The 2005 Extension confirms and restates the efficacy of the Master Lease:

> 8.1 Except as revised or amended or modified herein, all other terms and conditions of the Lease and all other documents attached thereto or incorporated therein remain fully enforceable and in effect and are incorporated herein and shall remain fully enforceable and in effect and survive any default herein by the Customer.

/ / /

4

1    A recital in the 2005 Extension confirms Celtic's title to the Equipment: "The

2    property that is the subject of the Lease is owned by Celtic."[2]

3    The Debtor made the Lease payments to Celtic until April 2005, when the

4    payments stopped. On June 16, 2005, Debtor moved to reject the Lease with a pleading

5    entitled "Motion for Authority to Reject Unexpired Leases (Celtic Leasing Corp.)" (the

6    "Rejection Motion"). In the Rejection Motion, the Debtor repeatedly referred to the

7    subject agreement as a "lease." The Rejection Motion states the "Debtor is a party to

8    several unexpired leases, many of which relate to leased equipment, no longer needed in

9    Debtor's downsized operation." It ended by noting that "[t]he Debtor believes that the

10   subject unexpired leases should be rejected because they are costly to maintain and

11   continually upgrade, and are unnecessary given Debtor's current circumstances." The

12   Debtor prayed for the following relief:

13       court order authorizing it to reject the subject unexpired leases and, if granted, that
         the claims resulting from the rejection be filed within sixty (60) days of service of
14       a copy of the order granting this Motion upon each claimant whose
         lease is rejected, and seeks such other and further relief as is just and proper.
15

16   Leddon signed a declaration in support of the Rejection Motion. He declared that

17   he was "familiar with the unexpired leases" and that "[t]here are three (3) equipment

18   lease contracts sought to be rejected by [the Rejection Motion]." He further stated, "[i]n

19   my business judgment, I assert that these leases are not economically feasible, confer no

20   benefit on the estate and should be rejected." He based this on "over 15 years experience

21   in the financial management of distressed companies" and status as a "Certified

22   Insolvency and Restructuring Advisor (CIRA) and Certified Turnaround Professional

23

24       [2]Notably, the 2005 Extension also contained the following language regarding
     the advice of its counsel:
25
         9. ADVICE OF COUNSEL. The Customer [Waterman] acknowledges that it
26       has reviewed this Amendment in its entirety, having consulted such legal, tax or
         other advisors as it deems appropriate and understands and agrees to each of the
27       provisions of this Amendment and further acknowledges that it that it has
         entered into this Amendment voluntarily.
28

5

(CTP)."

The Rejection Motion was granted. Celtic submitted the form of order entitled "Order Re Motion For Authority to Reject Unexpired Leases (Celtic Leasing Corp.)," which was entered on July 8, 2005. That order specifically authorized the Debtor "to reject the entire lease contracts [the Master Lease, Schedules, and Wells Fargo Assignments]" and set a bar date for the filing of "[a]ny claim(s) resulting from the rejection of the unexpired leases shall be filed within sixty (60) days of service of this Order."

On August 5, 2005 Celtic made a demand upon the Debtor for return of the Equipment under the rejected Lease.[3] Celtic also made a demand for the post-petition payments due under the Lease, which were still in default. Celtic timely filed the Celtic Claim on August 17, 2005. On August 23, 2005, Debtor filed an objection to the Celtic Claim, but withdrew it two days later.

In November 2005, Debtor filed the contested matter now before the court entitled "Objection to Administrative Expense Proof of Claim Number 335 (Celtic Leasing Corporation)" (the "Claim Objection"). Celtic filed a counter-motion for payment of the Celtic Claim as an administrative expense of the estate.

**Issue Presented**

The issue of whether Celtic is entitled to an administrative claim turns on whether the agreement between the parties constitutes a true lease or whether it amounts to a non-lease agreement, such as a financing or security agreement, disguised as a lease. If the agreement was a true lease, then Celtic has an administrative claim under 11 U.S.C. §§ 365(d)(10) and 503(b) based on the Debtor's pre-rejection obligation under the Lease and

---

[3]At the time of the oral argument in this matter, five months after entry of the order granting the Rejection Motion, none of the Equipment had been returned to Celtic. There appears to be a material dispute between the parties whether the Debtor refused to tender the Equipment or Celtic refused to accept it. Celtic contends that the software has not been removed from the Debtor's computers and is still being used. That issue will be addressed in a subsequent proceeding when the court determines the amount of Celtic's § 503(b) administrative claim.

1  post-rejection possession and use of the Equipment.  If the agreement is a financing and

2  security agreement, Celtic has an unsecured claim for a deficiency after liquidation of its

3  collateral.

4  **Analysis and Conclusions of Law**

5  **Applicable Law**

6      The Debtor's obligation to perform an unexpired personal property lease under §

7  365(d)(10)[4] gives rise to an administrative claim regardless of whether the lease is

8  subsequently rejected, and regardless of whether use of the leased property benefitted the

9  estate.  *See In re Pacific-Atlantic Trading Co.*, 27 F.3d 401, 403-05 (9th Cir. 1994)

10  (construing identical "trustee shall timely perform" language in § 365(d)(3) regarding an

11  unexpired lease of non-residential real property).  *See also In re Rebel Rents, Inc.*, 291

12  B.R. 520, 533 (Bankr. C.D. Cal. 2003) (applying the analysis in *Pacific-Atlantic Trading*

13  *Co.* to a personal property lease under § 365(d)(10)).

14      Celtic has the burden of proving that it has an administrative claim based, *inter*

15  *alia*, on the Lease.  *In re DAK Industries, Inc.*, 66 F.3d 1091, 1094 (9th Cir. 1995).

16  However, the burden is on Debtor to demonstrate by a preponderance of the evidence that

17  the Master Lease, the Schedules, and the 2005 Extension are not what they purport to be,

18  a true lease.  *See In re Murray*, 191 B.R. 309, 316 (Bankr. E.D. Pa. 1996).

19      The issue of whether an agreement is a lease or a non-lease security agreement is

20  governed by state law.  *In re Rebel Rents*, 291 B.R. at 525.  Here, the Master Lease

21  contains the following choice of laws provision: "APPLICABLE LAW: This Lease shall

22  be construed in accordance with and shall be governed by the laws of the State of

23

24      [4]11 U.S.C. § 365(d)(10) sets forth the Debtor's duties under an unexpired
25  personal property lease:

26      (10) *The trustee shall timely perform all of the obligations of the debtor* . . . first
    arising from or after 60 days after the order for relief in a case under chapter 11 of this
    title under an unexpired lease of personal property . . . until such lease is assumed or
27  rejected notwithstanding section 503(b)(1) of this title, unless the court, after notice and
    a hearing and based on the equities of the case, orders otherwise with respect to the
28  obligations or timely performance thereof. . . .  (emphasis added.)

7

California." Therefore, the court will apply California law to determine the true nature of the agreement. Because the applicable California statute, which defines the difference between a security interest and a lease, Cal. Comm. Code § 1201(36) is based on Uniform Commercial Code § 1-201(37), the court may also look to decisions from other jurisdictions which interpret the U.C.C. *See In re Rebel Rents*, 291 B.R. at 526.

**California Commercial Code**

Cal,. Comm. Code § 10103(a) defines a personal property lease as:

(10) "Lease" means a transfer of the right to possession and use of goods for a term in return for consideration, but a sale, including a sale on approval or a sale or return, or retention or creation of a security interest is not a lease. Unless the context clearly indicates otherwise, the term includes a sublease.

Cal. Comm. Code § 1201(36)(b) delineates the distinction between a lease and a security interest, in pertinent part, as follows:

(b) Whether a transaction creates a lease or security interest is determined by the facts of each case. However, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and any of the following conditions applies:

(i) The original term of the lease is equal to or greater than the remaining economic life of the goods.

(ii) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods.

(iii) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

(iv) The lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

(c) A transaction does not create a security interest merely because it provides one or more of the following:

(i) That the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or greater than the fair market value of the goods at the time the lease is entered into.

(ii) That the lessee assumes the risk of loss of the goods, or agrees to pay the taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods.

8

(iii) That the lessee has an option to renew the lease or to become the owner of the goods.

(iv) That the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed.

(v) That the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

To show that Celtic's Lease is actually a security agreement, the Debtor must establish that it has no right to voluntarily terminate the Lease and that one of the four provisions identified in section 1201(36)(b)(i) through (iv) applies. This inquiry has been referred to as the "Bright-Line Test." *In re Lerch*, 147 B.R. 455 (Bankr. C.D. Ill. 1992).

**The Terminability Factor**

The first prong of the Bright-Line Test focuses on whether the agreement is subject to termination by the lessee, *i.e.*, whether the lessee is obligated to pay the entire amount for the lease term without the right to terminate the lease early. If the consideration the lessee must pay for the term of the lease is not subject to termination by the lessee, then the transaction meets the first prong. *In re QDS Componets, Inc.*, 292 B.R. 313, 332 (Bankr. S.D. Ohio 2002). Here, paragraph 4 of the Master Lease authorizes termination by the Debtor, but only at the end of the Base Term of the Master Lease. The Schedules establish a new Base Term for the Schedules themselves, but they did not modify the Master Lease to authorize an early termination. The 2005 Extension extended the term of the Lease for an additional year without a right of early termination. It appears that the Debtor's obligation to pay Celtic was not subject to early termination. The court must therefore look at the Lease to see if any of the other factors under Cal. Comm. Code § 1201(36)(b) apply.

**Residual Value Factors**

Subsections (i) through (iv) of § 1201(36)(b) are referred to as the Residual Value Factors. *In re QDS Componets, Inc.*, 292 B.R. 313, 332 (Bankr. S.D. Ohio 2002). If the lease is not subject to early termination, and one of these Residual Value Factors is

9

present, then the court's inquiry ends and the transaction is deemed to have created a security interest. *Id.* at 333.

With regard to subsection 1201(36)(b)(i), the original term of both Schedules 2 and 3 appears to be less than the remaining economic life of the Equipment. Both Schedules state an original "Base Term" of 24 months, which would have expired in November 2003. At the end of the Base Term, the Equipment had remaining economic life as evidenced by the fact that the Debtor elected to extend the Lease and continued to use the Equipment after the Base Term expired. The Debtor failed to establish that the Base Term of the Lease is equal to or greater than the remaining economic life of the Equipment. Therefore, the "economic life" factor embodied in Cal. Comm. Code § 1201(36)(b)(i) is not present.

With regard to subsection 1201(36)(b)(ii), that factor is met when the lessee is "bound," meaning contractually obligated, to renew the Lease "for the remaining economic life of the goods," or is bound to become the owner of the goods. Stated differently, the Lease must require the Debtor to either renew the Lease for the remaining economic life of the Equipment, or to purchase the Equipment for the fair market value agreed to in the Schedules, 36.8% of its original cost. The specific language in the Lease is recited above.

The Debtor was not contractually obligated to renew the Lease for the remaining economic life of the Equipment, or for any other term. The Debtor had an *option* to purchase the Equipment or to renew the Lease for one year. There is no evidence to suggest that a one-year extension amounts to "the remaining economic life of the goods." Similarly, the Debtor was not contractually obligated to become the owner of the Equipment; again, that was an available option. Indeed, Leddon's Cover Letter to the 2005 Extension kept open the option to surrender the Equipment all together. It states that at the end of the 2005 Extension, Debtor will "buyout the equipment . . . at fair market value, or return it to the Lessor." Accordingly, the "bound to renew or become the owner" factor embodied in § 1201(36)(b)(ii) is not present.

10

With regard to subsections 1201(36)(b)(iii) and (iv), the issue is whether the "renew or own" options were valued at "nominal or no additional consideration." Under the Master Lease, the "renewal option" was based upon the then "fair market value of the Equipment" and "subject to the then prevailing interest rates, Lessee's credit standing, and such other terms and conditions to be mutually agreed upon by Lessee and Lessor." Under the Schedules, the "renewal option" was tied to "the rental amount in effect as of the last billing cycle of the Base Term." Under the 2005 Extension, the Debtor did not reserve the option to renew at all. Turning now to the "purchase option," under the Master Lease, the "purchase option" was fixed at the Equipment's "fair market value" at the expiration of the lease term. The Schedules both fix the purchase price at 36.8% of the Equipment's total cost. Again, at no time were the "renew or own" options available to the Debtor for "no additional consideration."

Therefore, the remaining issue is whether the "renew or own" options were available to the Debtor for "nominal" consideration. Subsection 1201(36)(d)(i) of the Cal. Comm. Code defines when consideration is and is not "nominal" within the meaning of subsection 1201(36)(b):

> Additional consideration is not nominal if (A) when the option to renew the lease is granted to the lessee, the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed, or (B) when the option to become the owner of the goods is granted to the lessee, the price is stated to be the fair market value of the goods determined at the time the option is to be performed. Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised.

Here, under the Master Lease, the Debtor had the option to renew the lease at the end of the Base Term, or any extended term, for "its then fair market value" to be determined by agreement of the parties or by independent appraisers. This is in line with what Cal. Comm. Code § 1201(36)(d)(i) defines as "*not nominal*" consideration. Under the Schedules, the consideration required to renew was "the rental amount in effect as of the last billing cycle of the Base Term." Again, this is not "nominal." The fact that the "renewal" rental was fixed in the Schedules as the prior rental amount suggests that the

11

1    renewal option was for at least fair market value. The Debtor offered no evidence that the

2    consideration required to renew was "nominal." Therefore, § 1201(36)(iii) is not met.

3          As for the "purchase option," under the Master Lease and the 2005 Extension, the

4    Debtor was required to pay "fair market value" in order to purchase the Equipment. This

5    is not "nominal consideration." Under the Schedules, the consideration for the purchase

6    option was fixed at "36.8% of the total Equipment cost, which cost includes all related

7    disbursements made by Lessor or its Assignee." Again, this "fixed" price is not nominal

8    under § 1201(36)(d)(i).

9          In 1990, the Cal. Comm. Code § 1201 was amended to conform to revisions made

10   by the drafters of the Uniform Commercial Code to § 1-201. *In re QDS Components,*

11   *Inc.*, 292 B.R. 313, 330 (Bankr. S.D. Ohio 2002) (applying California law). The 1990

12   amendment eliminated any reference to a percentage test for nominality. *See In re*

13   *Charles*, 278 B.R. 216, 224 (Bankr. D. Kan. 2002) (holding that the enactment of new

14   U.C.C. § 1-201(37), which disavows percentage tests, supersedes the authorities applying

15   the percentage tests (quoting White & Summers, U.C.C. § 30-3, 4 ed. 1995 &

16   Supp.2001)); *In re Beckham*, 275 B.R. 598, 604 (D. Kan. 2002) (concluding that Tenth

17   Circuit authority endorsing a bright-line rule that option prices of less than 25% of the

18   original equipment cost are per se nominal "has been superceded by the amendments to

19   [§ 1-201(37)]") .

20         Moreover, even if the percentage test had survived the enactment of U.C.C. §

21   1-201(37), courts and commentators have pointed out that such tests are not a reliable

22   indicator of nominality. *See In re APB Online, Inc.*, 259 B.R. 812, 819-20 (Bankr.

23   S.D.N.Y. 2001) (rejecting percentage tests because they are "the crudest proxies for the

24   correct calculation"(quoting 4 White & Summers, U.C.C. § 30-3 at 20)).

25         In this case, the court is persuaded that 36.8% of the Equipment cost is "not

26   nominal." The Debtor presented no evidence on this point. Therefore, § 1201(36)(iv) is

27   not met. As a result, the Bright Line Test has not been satisfied. The Celtic Lease

28   appears from its terms to be a true lease.

12

## The Economic Realities of the Transaction

Finally, after determining that the "Bright Line Test" has not been satisfied, the court must examine the "economic realities" of the transaction. *In re QDS Components*, 292 B.R. at 333 (citing *In re Triplex Marine Maintenance, Inc.*, 258 B.R. 659, 669 (Bankr. E.D. Tex. 2000)). The key issue in this inquiry is whether the lessor retains a meaningful residual interest at the end of the lease term. *Id.* If there is a meaningful reversionary interest for the lessor--either an up-side right or a down-side risk--the parties have entered into a lease, not a security agreement. If there is no reversionary interest, the parties have entered into a security agreement. *In re QDS Components*, 292 B,R. at 333 (quoting White & Summers, § 30-3 at 30).

Under California law, in determining whether the lessor retained a meaningful reversionary interest, the court considers two factors: (1) whether the purchase option price is nominal; and (2) whether the agreement contains any provision for the lessee's acquisition of equity in the subject property. *Addison v. Burnett*, 41 Cal. App. 4th 1288, 1296 (1996). The *Addison* court looked to the bankruptcy court's decision in *In re Zaleha*, 159 B.R. 581, 585 (Bankr. D.C. Idaho 1993) for an explanation of the "economic realties" test:

> If a lease contains an option to purchase for no or nominal consideration . . . it suggests that the lessor does not care, in an economic sense, whether or not the option is exercised. If the lessee develops equity in the leased property such that the only sensible decision economically for the lessee is to exercise the option . . . it suggests the lessor did not expect the return of leased goods.

Here, Application of the *Addison* factors leads to a determination that Celtic retained a meaningful reversionary interest in the Equipment. As elucidated above, the purchase option price was not "nominal." Nothing in the Master Lease, the Schedules, or the 2005 Extension created an equity interest for the Debtor in the Equipment. Indeed, the Debtor expressly reserved the right to purchase the Equipment or surrender it at the end of the 2005 Extension, which suggests that the Debtor had no expectation of acquiring an equity interest, or owning the Equipment, without paying for it at fair market value. Therefore, the *Addison* factors are absent: Celtic did retain a meaningful residual,

13

1     or reversionary interest in the Equipment.

2            The Debtor argues that the Master Lease is a finance/security agreement because

3     the Equipment was obtained from a third-party supplier; stated differently, because Celtic

4     did not manufacture the Equipment. This fact is not conclusive of the issue because

5     Celtic retained a "meaningful reversionary interest" in the Equipment. *See, e.g., In re*

6     *Edison Bros. Stores, Inc.*, 207 B.R. 801, 821 (Bankr. D.Del. 1997). ("[T]he fact that the

7     role of the lessor is that of a financier is inconclusive to show that a disguised secured

8     transaction was intended because this kind of three party transaction is typical in true

9     lease[s] as well as in installment sales.").

10           Galena argues that it has a security interest in the Equipment that is senior to that

11    of Celtic. It points to the fact that Galena has a financing statement which was filed

12    earlier in time than Celtic's financing statement. However, Galena's argument begs the

13    question of whether the Master Lease constituted a true lease. The filing of a financing

14    statement by a lessor is not determinative of true lease status. *See, e.g., In re Owen*, 221

15    B.R. 56, 62 (Bankr. N.D.N.Y. 1998). ("The fact that [the lessor] filed financing

16    statements . . . [does not establish a disguised security agreement]. Rather, . . . the filing

17    of the financing statement was the result of an abundance of caution to assure that [the

18    lessor's] rights were protected.")

19           Debtor contends that Celtic simply financed the Debtor's purchase of the

20    Equipment. Debtor argues that Celtic never owned the Equipment and was not the

21    licensee of the software. However, a financing agreement can be in the form of a true

22    lease, the two concepts are not mutually exclusive. Under Cal. Comm. Code § 10103(7),

23    a "finance lease" is a true lease if certain elements are met; namely, (1) the lessor does not

24    manufacture or supply the goods, (2) the lessor acquires the goods or the right to

25    possession and use of the goods in connection with the lease, and (3) the right to

26    possession and use of the goods is a condition to the effectiveness of the lease contract.

27    All of these elements exist with regard to the Lease. Celtic did not manufacture or supply

28    the Equipment. The Debtor had the right to "quiet enjoyment" possession and use of the

14

1    Equipment only during the term of the Lease.  By the terms of the Lease, Celtic owned

2    the Equipment at all times, which gave it the right to possession and use of the goods

3    upon expiration of the Lease if the Debtor did not exercise the purchase option.  Add to

4    this the "economic realities" analysis based on the absence of the two *Addison* factors

5    above, and the Debtor's argument fails.

6        The Debtor further argues that Celtic never owned the Equipment.  However, the

7    Debtor's argument is inconsistent with the express language in the Master Lease and the

8    2005 Extension, both of which the Debtor signed.  The Master Lease states, "Except as

9    otherwise provided in this Lease or any Schedule hereto, title to the Equipment shall at all

10   times remain in Lessor."  The 2005 Extension states, "The property that is the subject of

11   the Lease is owned by Celtic."  In the 2005 Extension, the Debtor also reserved the right

12   to surrender the Equipment back to Celtic.  Based on the plain language in these

13   documents, the Debtor is not in a position to argue now that Celtic was not the owner of

14   the Equipment, or that the Debtor ever intended to own the Equipment.  The Debtor

15   offers no evidence that it ever treated the Equipment as its own.  For example, there is no

16   evidence as to how the Debtor treated the Equipment for tax reporting purposes, *i.e.*, did

17   it deduct the Lease payments as a business expense or depreciate the Equipment

18   according to an approved depreciation schedule?

19       In Leddon's declaration, he states that he "believed" that Celtic never owned the

20   Equipment.  Leddon's declaration is disingenuous and unworthy of any weight.  There is

21   no evidence that Leddon, as the Debtor's "Chief Restructuring Officer," was even around

22   in 1996 and 2001 when the Debtor signed the Master Lease and the Schedules

23   respectively, so he had no personal knowledge of what the Debtor intended the

24   documents to mean.  Further, Leddon's self-serving and opportunistic statement starkly

25   contradicts all of the documents which he actually signed and filed with the court during

26   the course of this case.  Finally, his declaration of "belief" is largely irrelevant under §

27   1201(36), as the Official Comment to the U.C.C. states:

28   / / /

> Reference to the intent of the parties to create a lease or security interest has led to unfortunate results. In discovering intent, courts have relied upon factors that were thought to be more consistent with sales or loans than leases. Most of these criteria, however, are as applicable to true leases as to security interests. Examples include the typical net lease provisions, a purported lessor's lack of storage facilities or its character as a financing party rather than a dealer in goods. *Accordingly, amended [U.C.C.] Section 1-201(37) deletes all reference to the parties' intent.* (emphasis added.)

Cal. Comm. Code § 1201(36) cmt. Uniform Commercial Code.

Galena and the Committee both argue that the Lease may be a "sham" transaction. Galena and the Committee disregard the fact that the Debtor bears the burden of proof on that allegation. The Debtor certainly did not treat the Lease as a "sham" before its chapter 11 plan got confirmed and before Celtic started pushing for payment of an administrative claim. The court cannot even consider this argument without admissible evidence. The Master Lease, the Schedules, and the 2005 Extension are clear and unambiguous, and all the parties to these agreements were sophisticated. This court will honor the plain language of the contract in the absence of a reason to do otherwise. *See Sharon Steel Corporation v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2nd Cir. 1982).

Finally, the court notes that the Debtor has repeatedly referred to the Lease as a "lease" in all of its pleadings throughout the course of this bankruptcy case. For example, in the Rejection Motion, the Debtor referred to and treated the Lease as a "lease." In addition, the Wells Fargo Assignments were replete with references to the term "lease." The Debtor's sudden and opportunistic change of position now, after the chapter 11 plan has been confirmed, and the time has come to actually pay the administrative claims, does not pass the proverbial "smell test."

**Calculation of the Administrative Expense Claim**

The full amount of Celtic's administrative claim remains unliquidated, but some of it can be allowed and paid immediately. There are three distinct components to Celtic's Claim. First, Celtic argues that it is entitled to receive the post-petition lease payments that came due during the pre-rejection period from April 2005 through July 2005 pursuant to § 365(d)(10) ("Pre-Rejection Payments"). The court agrees with Celtic

16

1  on the first point.  Celtic is entitled to receive the Pre-Rejection Payments at the amount

2  stated in the Lease.  The plain language of § 365(d)(10) required the Debtor to timely pay

3  the rent due until the Lease "from or after 60 days after the order for relief" until the

4  Lease was rejected.  The Debtor stopped making the Lease payments after expiration of

5  60 days and Celtic is not claiming any payments during that period.  Construing virtually

6  identical language in § 365(d)(3), the Ninth Circuit stated in *In re Pacific-Atlantic*

7  *Trading Co.*, 27 F.3d at 404:

8      By providing for timely performance of *all* lease obligations, "notwithstanding
       section 503(b)(1)," the statute has already granted priority payment status to the
9      full amount of rent due . . . .  The fact that a trustee does not comply with this
       directive before the lease is rejected cannot justify denying a lessor the priority
10     treatment for the full amount which Congress has already bestowed upon it.
       (emphasis original.)
11

12      Second, Celtic argues that the 2005 Extension created an independent

13  administrative liability for the full term of the extension and that Celtic is therefore

14  entitled to receive post-rejection lease payments for the remainder of the 2005 Extension;

15  for the period from August 2005 through to April 2006 ("Post-Rejection Claim").  Here,

16  the court disagrees in part with Celtic.  The "extended" Lease was never formally

17  assumed pursuant to § 365(a), so the full "extended" term of the Lease did not become an

18  administrative liability.  The 2005 Extension extended the term of the Lease, but it did

19  not cut off the Debtor's right to reject the Lease during that term.  Celtic is entitled to an

20  administrative claim under § 503(b) measured by the "actual and necessary" value to the

21  estate of the Debtor's hold-over possession and use of the Equipment.  This amount is

22  presumed to be the amount stated on the face of the Lease, but this presumption is

23  rebuttable upon a showing that the actual use value of the Equipment was demonstrably

24  less.  *In re Trak Auto Corp.*, 277 B.R. 655, 667 (Bankr. E.D. Va. 2002)).  Accordingly,

25  the value of the Post-Rejection Claim is a question of fact and will require discovery and

26  additional evidence.

27      Third, Celtic argues that it is entitled to recover the value of the Equipment on the

28  theory that the Equipment was converted post-rejection ("Conversion Claim").  The court

17

does not have enough evidence to determine whether a conversion of the Equipment has actually occurred, when it occurred, or what the damages should be. The Conversion Claim, if any, may or may not be entitled to administrative priority depending, *inter alia*, on if and when the alleged conversion actually occurred. *See In re National Refractories & Minerals Corp.*, 297 B.R. 614, 619 (Bankr. N.D. Cal. 2003) (landlord's administrative claim for real property damage depends on when the damage occurred). Again, that issue will require discovery and an evidentiary hearing.

**Conclusion**

Based on the foregoing, the Court finds and concludes that the Master Lease Agreement and related documents constitute a true lease. Accordingly, the Motion by Celtic Leasing for Payment of Administrative Claim will be granted to the extent Celtic seeks allowance and payment of the Pre-Rejection Payments. Celtic's Post-Rejection Claim is entitled to administrative priority under § 503(b) in an amount to be determined in a future evidentiary hearing. Likewise, Celtic's alleged Conversion Claim will require an evidentiary hearing. The Debtor's Objection to Administrative Expense Proof of Claim No. 335 will be denied to the extent the Debtor wants all of Celtic's Claim disallowed, or classified as an unsecured non-priority claim. By separate order, this matter will be set for further briefing and hearing with regard to liquidation of Celtic's Post-Rejection Claim and allowance of the Conversion Claim.

DATED:   May ___/ 7___, 2006

W. Richard Lee
United States Bankruptcy Judge

18

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF CALIFORNIA**

**CERTIFICATE OF MAILING**

The undersigned deputy clerk in the office of the United States Bankruptcy Court for the Eastern District of California hereby certifies that a copy of the document to which this certificate is attached was mailed today to the following entities listed at the address shown on the attached list or shown below.

| | | |
|---|---|---|
| Waterman Industries, Inc.<br>PO Box 3257<br>Clovis, CA 93613 | Riley C. Walter<br>7110 N Fresno St #400<br>Fresno, CA 93720 | 04-11065-B-11<br>Waterman Industries, Inc. |
| Michael Terry Hertz<br>PO Box 40012<br>Fresno, CA 93755-0012 | Donald W. Fitzgerald<br>400 Capitol Mall #1450<br>Sacramento, CA 95814-4434 | Randy Rogers<br>101 California St #3900<br>San Francisco, CA 94111 |
| Office of the U.S. Trustee<br>United States Courthouse<br>2500 Tulare St #1401<br>Fresno, CA 93721 | | |

**DATED:** May 18, 2006

**By:** _Diana S. Morales_
      **Deputy Clerk**

**EDC 3-070 (New 4/21/00)**