

FILED

MAR 3 0 2007

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

POSTED ON WEBSITE

## NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
EASTER DISTRICT OF CALIFORNIA
FRESNO DIVISION

In re ) Case No. 04-11065-B-11
)
Waterman Industries, Inc., ) DC No. WLG-134
)
     Debtor. )
————————————————————)

## MEMORANDUM DECISION REGARDING OBJECTION TO CLAIM AND INTERPRETATION OF CHAPTER 11 PLAN

Gregory S. Powell, Esq., of the Walter Law Group, appeared on behalf of WII Liquidation, Inc., formerly known as the debtor Waterman Industries, Inc. (the "Debtor").

Beth Maxwell Stratton, Esq., of Seng & Stratton, appeared on behalf of James E. Salven, chapter 7 trustee for Waterman Industries Sales, Inc. (the "Trustee").

**This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of res judicata and claim preclusion**

     The Debtor objects to a general unsecured claim (the "WISI Claim") filed by Waterman Industries Sales, Inc. ("Waterman Sales") which seeks reimbursement of money used to pay the Debtor's secured creditor, Wells Fargo Bank, N.A. ("Wells Fargo"). The Debtor acknowledges that funds belonging to Waterman Sales were used to pay Wells Fargo, but contends that it has no obligation to pay the WISI Claim (the "Claim Objection") under the terms of the Debtor's confirmed first amended chapter 11 plan (the "Plan"). Liquidation of the WISI Claim will involve substantial discovery and additional litigation. The court has therefore bifurcated the "liability" portion of the Claim Objection for resolution before the parties litigate the remaining issues.

     This Claim Objection requires an analysis of the Plan, together the pre and postpetition financial arrangements between the Debtor, Waterman Sales, and two

financial institutions, Wells Fargo and its successor-in-interest, Galena National Investments, LLC ("Galena"). The court therefore deems the Claim Objection, and Waterman Sales' opposition thereto, to include a motion by both parties for interpretation of the Plan with regard to its classification and treatment of the WISI Claim.[1] For the reasons set forth below, the Claim Objection will be overruled. The WISI Claim shall be allowed and treated as a general unsecured claim under Class 3-A of the Plan.

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 11 U.S.C. §§ 502[2] and 1141, and General Orders 182 and 330 of the U.S. District Court for the Eastern District of California. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1)(B) and (O). This memorandum decision contains findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052, made applicable to this proceeding by Federal Rule of Civil Procedure 52.

**Background.**

The Debtor was engaged in the business of manufacturing water control gates, valves and related equipment used in the agricultural irrigation and waste water treatment industries. Waterman Sales was an affiliate of the Debtor.[3] Prior to this bankruptcy, its function was to market and sell on consignment products manufactured by the Debtor in

---

[1] Under Article 11 of the Plan, this court retains jurisdiction to determine (1) the allowance of claims, (2) disputes regarding the classification of claims, and (3) any dispute regarding interpretation of the Plan.

[2] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, as enacted and promulgated *prior* to the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, Apr. 20, 2005, 119 Stat. 23.

[3] The record is unclear as to whether the Debtor owns Waterman Sales or vice-versa. There is also evidence to suggest that as much as 49% of the Debtor may be owned by third parties. Resolution of the dispute is not important here. However, it does confirm that the Debtor and Waterman Sales were separate and distinct entities for purposes of the discussion that follows.

locations not covered by the Debtor's sales staff.  The Debtor and Waterman Sales maintained separate books and records, they had separate creditors, and until sometime prior to the bankruptcy filings, they had their own employees.

The Debtor and Waterman Sales both filed bankruptcy petitions under chapter 11 on February 10, 2004.[4]  After that time, Waterman Sales had no employees.  All postpetition business operations of Waterman Sales were conducted by employees of the Debtor for a "fee" of $20,000 per month.  The Debtor contends that it has a claim against Waterman Sales for payment of these "administrative services."[5]

The Debtor's principal secured creditor was Wells Fargo.  At commencement of this case, the Debtor owed Wells Fargo more than $10 million (the "Wells Fargo Debt") under a set of credit agreements dating back to December 2000.  The Wells Fargo Debt was secured by a security interest in virtually all of the Debtor's assets, including its bank accounts and accounts receivable.  Wells Fargo also held personal guarantees from the Debtor's principals.

In June 2003, Waterman Sales gave Wells Fargo a Continuing Guaranty of the Wells Fargo Debt (the "WISI Guaranty").  In addition, in December 2000 and January 2003, Waterman Sales executed two security agreements granting Wells Fargo a security interest in, *inter alia,* its accounts receivable and equipment respectively (the "WISI Security Agreements").

In January 2004, Wells Fargo began enforcing its security interests by taking the cash (more than $300,000) from the Debtor's and Waterman Sales' bank accounts and

---

[4]Waterman Sales' bankruptcy case was assigned # 04-11067.

[5]This expense is reflected as a "Management & Admin. Fee (WII)" in some of the budgets attached to early cash collateral orders so it is not clear why these management fees were not paid in the ordinary course of business using Wells Fargo's cash collateral. However, this court has never specifically authorized Waterman Sales to enter into any "administrative" agreement with the Debtor or to pay the Debtor for "administrative services."

1   commencing a civil action for the appointment of a receiver. Those actions forced both
2   the Debtor and Waterman Sales to temporarily suspend business operations and seek
3   bankruptcy protection. At the commencement of this case, both debtors were controlled
4   by the same principals and both debtors were represented by the same counsel. Shortly
5   after the petitions were filed, the Debtor and Waterman Sales brought motions to have
6   their cases jointly administered utilizing the same management personnel and the same
7   professionals. Those motions were denied, in part because the two entities appeared to
8   have different creditors and inter-corporate claims against each other. On March 12,
9   2004, Waterman Sales retained separate counsel.

10          The Debtor filed its schedules on February 20, 2004, and amended the schedules in
11   April 2004. The Debtor's amended schedules list an account receivable owed from
12   Waterman Sales to the Debtor in the amount of $161,022, purportedly for "inter-company
13   debt." The schedules filed in the Waterman Sales' case list the Debtor as an unsecured
14   creditor for approximately $79,500. For reasons that have never been adequately
15   explained, the Debtor's schedules do not list Waterman Sales as a creditor
16   notwithstanding the fact that Waterman Sales had guaranteed the Wells Fargo Debt.

17          In June 2004, Wells Fargo filed a proof of claim in the Debtor's case in the amount
18   of $10,389,447.03 for "money lent." Wells Fargo also filed a proof of claim in the
19   Waterman Sales' case for the same amount based on the WISI Guaranty. In January
20   2005, Wells Fargo amended and reduced its claim against Waterman Sales to the amount
21   of $9,959,343.27 for "money lent" and "obligations owed under Guaranty" (the "Wells
22   Fargo Claim").

23          The Waterman Sales' case was converted to chapter 7 on September 7, 2004. The
24   Trustee was appointed on September 9, 2004. On December 3, 2004, the Trustee filed
25   the WISI Claim on behalf of Waterman Sales for $10,389,447, the same amount stated in
26   the initial Wells Fargo Claim. The basis for the WISI Claim is stated as follows:
27   / / /
28   / / /

4

1  Waterman Industries Sales, Inc., as guarantor of the debt owed by Waterman
   Industries, Inc. to Wells Fargo . . . is entitled to a claim against Waterman
2  Industries, Inc. for all sums recovered by Wells Fargo Bank from Waterman
   Industries Sales, Inc.
3

4      In June 2005, Galena acquired the Wells Fargo Debt, as well as all of the rights

5  and obligations pertaining thereto, including the WISI Guaranty and WISI Security

6  Agreements.  Galena thereby became the successor in interest to all rights previously held

7  by Wells Fargo (hereafter the "Galena Debt").  Galena filed a Notice of Transfer of Claim

8  Other Than for Security in the Waterman Sales' case to document the fact that the Wells

9  Fargo Claim had been absolutely transferred and assigned to Galena (hereafter "Galena's

10  Claim").  Galena's Claim has not been withdrawn or amended to reflect any reduction or

11  adjustment based on payments received after commencement of the bankruptcy cases, or

12  confirmation of the Debtor's Plan.

13  **The Disclosure Statement, the Plan and the Subordination Payments.**

14      The court confirmed the Debtor's Plan in December 2005.  The Trustee was served

15  with the Plan, but did not vote to reject it or object to its confirmation.  Waterman Sales

16  was not specifically mentioned in the Debtor's first amended disclosure statement (the

17  "Disclosure Statement"),[6] or the Plan, and the WISI Claim was not separately classified

18  or provided for in the Plan.  Similarly, the Disclosure Statement and Plan fail to make any

19  distinction between the WISI Claim and the other general unsecured creditors.  If the

20  WISI Claim is allowed in any amount, it appears from the face of the Disclosure

21  Statement and Plan that the WISI Claim will be treated as a general unsecured claim in

22  Class 3-A of the Plan.[7]

23  _____

24      [6]The Disclosure Statement was filed on October 25, 2005 and approved by an
25  order entered on October 27.

26      [7]The Plan provides for treatment of general unsecured claims in Article 3,
27  paragraph 3.3 in pertinent part as follows:

28      Class 3-A is impaired. . . .  Each holder of such a Claim shall receive Pro Rata

5

The WISI Guaranty contained a subordination provision (the "Subordination

Clause") which subordinated Waterman Sales' right to receive any payments from the

Debtor to Wells Fargo's right to receive payments from the Debtor on account of the

Wells Fargo Debt. The Subordination Clause also gave Wells Fargo a security interest in

any obligation owed from the Debtor to Waterman Sales. The Subordination Clause

provided in pertinent part:

> SUBORDINATION. Any Indebtedness of [the Debtor] now or hereafter held by
> [Waterman Sales] is hereby subordinated to the Indebtedness of [the Debtor] to
> Bank. Such Indebtedness of [the Debtor to Waterman Sales] is assigned to Bank
> *as security* for this Guaranty and the Indebtedness and, if Bank requests, shall be
> collected and received by [Waterman Sales] as trustee for Bank and paid over to
> Bank on account of the Indebtedness of [the Debtor] to Bank but without reducing
> or affecting in any manner the liability of [Waterman Sales] under the other
> provisions of this Guaranty. (Emphasis added.)

Based on the Subordination Clause, the Plan created a term which is central to this

Claim Objection known as "Subordination Payments" defined as follows:

> Subordination Payments are Distributions under the Plan that are payable to
> *persons or entities* whose claims have been contractually subordinated to the claim
> held by Galena and which as a result thereof would be payable to Galena rather
> than to the original holder of such claims. (Emphasis added.)

The Plan contemplates that the assets of the Debtor would revest in the Debtor

upon confirmation. Thereafter, some of the assets were acquired, via an Asset Purchase

Agreement by a new entity, GNI Waterman, Inc. ("GNI Waterman") which is wholly-

owned by Galena. GNI Waterman continued the business operations of the Debtor. GNI

Waterman made a $1.25 million cash payment to the Debtor to help fund the Plan, and

---

> Distribution from any proceeds of Plan Assets available after Distributions
> required by this Plan have been made to holders of allowed Nonclassified Claims
> and Allowed [priority claims, real property taxes, and Convenience] Claims. Such
> Distributions shall be made from time to time in the discretion of the [Liquidating
> Agent] in an amount not to exceed the amount of such Allowed Claims and in a
> manner consistent with the provisions of this Plan. (All capitalized terms are
> defined in the Plan or in the Order Confirming Chapter 11 Plan and Fixing Bar
> Dates entered on December 13, 2005.)

assumed all of the Galena Debt.  The remaining assets are being liquidated by Clifford

Bressler, the "Liquidating Agent."  The Plan establishes a designated fund, the "Plan

Account" from which payments will be made to unsecured creditors.  The distribution to

unsecured creditors after payment of administrative and priority claims is estimated in the

Disclosure Statement to be between $739,200 and $2,839,000.  Galena will not receive

any payments from the Plan Account or from any assets not specifically designated for

payment of its claim.

The Galena Debt is provided for in Class 2-A of the Plan.  The Plan proclaims the

Galena Debt to be "fully secured" and provides that Galena will receive the proceeds

from liquidation of various specified assets.  Galena agreed to release its lien against the

remaining assets of the Debtor and the Debtor has no further obligation to make any

payments to Galena.  In the last sentence of the section dealing with Class 2-A, treatment

of the Galena Debt, the Plan purports to "assign" the Subordination Payments back to the

Debtor for distribution to the unsecured creditors.  Specifically, the Plan provided for

treatment of the Galena Debt as follows:

> 3.2.1 Class 2-A (Galena): Class 2-A is impaired.  Galena's Secured Claim shall be
> assumed by [GNI Waterman] and the *Debtor shall have no responsibility for
> payment of the Galena Secured Claim*; provided that Galena shall be entitled to
> also receive (a) fifty percent (50%) of the Excess Proceeds of Specified
> Receivables which shall be paid by the Debtor to Galena promptly upon the
> Debtor's receipt thereof, and (b) if the Foundry has no [sic] been sold prior to the
> Effective Date, 40% of the net proceeds from sale of the Foundry, with such
> proceeds paid to Galena directly from escrow of any sale.  *Any Subordination
> Payments to which Galena is entitled are hereby assigned to the Debtor and may
> be retained by the General Manager as Plan Assets for Distribution to Class 3-A.*
> (Emphasis added.)

**The Trustee's Reimbursement Claim.**

In the months after commencement of this case, the Debtor and Waterman Sales

entered into a series of cash collateral agreements with Wells Fargo which were approved

by this court (the "Cash Collateral Orders") and which authorized the Debtor to use the

postpetition proceeds of accounts receivable to continue operating its business.  Those

Cash Collateral Orders also required Waterman Sales to make "adequate protection"

payments to Wells Fargo, based on the WISI Guaranty, using postpetition proceeds of

1 | Waterman Sales' accounts receivable.

2 |     During the time that Waterman Sales was in chapter 11, it shared with the Debtor a

3 | common post office box for the remittance of payments on their accounts receivable. The

4 | Trustee contends that the Debtor's employees took checks representing payment of

5 | Waterman Sales' accounts receivable and delivered those monies to Wells Fargo. There

6 | is a material dispute between the parties as to whether the Debtor failed to keep, or has

7 | failed to produce, a complete and accurate accounting of those transfers. However, the

8 | Debtor acknowledges in this Claim Objection that at least $965,000 of Waterman Sales'

9 | money was collected and turned over to Wells Fargo between February and August

10 | 2004.[8]

11 |     The WISI Claim seeks reimbursement for all monies used by the Debtor or paid to

12 | Wells Fargo on the Debtor's behalf. The Debtor contends in this Claim Objection that the

13 | Plan exonerates the Debtor from having to reimburse Waterman Sales for any money so

14 | used. The WISI Claim may also be subject to offset by the Debtor - the Debtor has filed a

15 | proof of claim in Waterman Sales' case for $309,300 for "goods sold." The exact, or

16 | estimated, amount of the WISI Claim will require additional discovery and litigation. The

17 | court has bifurcated those issues for determination at a later time if necessary.

18 | **The Claim Objection.**

19 |     The Debtor objects to the WISI Claim on several grounds. Initially, the Debtor

20 | contended that the WISI Claim was untimely because it was filed after the June 10, 2004,

21 | bar date which this court had previously approved for the filing of claims (the "Bar

22 | Date"). The Debtor also argued that the WISI Claim was not adequately documented. At

23 | the first hearing, the court stated its intention to overrule the "timeliness" objection and

24 | set the matter for further hearing after discovery on the "liquidation" issue. The Debtor

25 | then amended the Claim Objection to include the "subordination" issue addressed herein.

26 |

27 |     [8]The Debtor also acknowledged in the Disclosure Statement that Wells Fargo

28 | received approximately $900,000 from the bankruptcy estate of Waterman Sales.

The Debtor argues that it has no obligation to pay the WISI Claim because the Claim was subordinated to the Galena Debt. The subordination issue calls for an interpretation of the Plan itself. The Plan purports to assign the Subordination Payments back to the Debtor for use to pay unsecured creditors other than Waterman Sales. The Debtor also argues that any claim of Waterman Sales is contingent and must be disallowed under § 502(e)(1)(B).

**Issues Presented.**

      1. Was the WISI Claim timely filed?

      2. Did the Plan's assignment of the Subordination Payments to the Debtor exonerate the Debtor from its obligation to reimburse Waterman Sales for money paid to Wells Fargo on account of the WISI Guaranty?

      3. Is the WISI Claim a contingent claim?

**Burden of Proof.**

      A proof of claim executed and filed in accordance with the Federal Rules of Bankruptcy Procedure constitutes *prima facie* evidence of the validity and amount of the claim. Fed.R.Bankr.P. 3001(f). Upon objection, the proof of claim provides "some evidence as to its validity and amount" and carries over a "mere formal objection." *Lundell v. Anchor Const. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000). The objector must produce sufficient evidence "tending to defeat the claim by probative force equal to that of the allegations in the proofs of claim themselves." *Id.* (citing *Wright v. Holm (In re Holm))*, 931 F.2d 620, 623 (9th Cir.1991)(citations omitted). The claimant must "prove the validity of the claim by a preponderance of the evidence. The ultimate burden of persuasion remains at all times upon the claimant." *Lundell*, 223 F.3d at 1039. The Debtor, as the Plan's drafter and proponent, has the burden of proof in this dispute relating to interpretation of the Plan.

/ / /

/ / /

/ / /

9

1 **Analysis.**

2 **The WISI Claim was not Untimely.**

3      The Debtor first argued that the WISI Claim should be disallowed as "untimely"

4 because it was filed after the Bar Date. At the initial hearing, the court overruled that

5 objection for reasons stated on the record and supplemented below. The court found,

6 *inter alia,* that the Bar Date could not apply to Waterman Sales and the Trustee. Both the

7 Debtor and Waterman Sales were initially represented by the same law firm. Prior to

8 conversion of Waterman Sales' case to chapter 7, the business operations of the Debtor

9 and Waterman Sales were conducted by the same people, the Debtor's principals and

10 employees. Waterman Sales had no employees and no ability to file its own proof of

11 claim. The Debtor was diverting hundreds of thousands of dollars of Waterman Sales'

12 money to reduce the Wells Fargo Debt, the same Debt that was personally guaranteed by

13 the Debtor's principals who should have protected Waterman Sales' interests. Yet, the

14 Debtor failed to schedule Waterman Sales as an unsecured creditor and failed to file a

15 proof of claim on its behalf. The Debtor properly scheduled and filed its own claim

16 against Waterman Sales based on purported "inter-company debt." The Debtor also had a

17 responsibility to protect Waterman Sales' interests with regard to the same "inter-

18 company debt," but blatantly failed to do so.

19      On the Bar Date, Waterman Sales was still in chapter 11, totally under the

20 management and control of the Debtor. That arrangement continued until the case was

21 converted to chapter 7 in September 2004, about three months *after* the Bar Date. The

22 Trustee could not have received notice of the Bar Date as a matter of law, and could not

23 have filed a timely proof of claim on behalf of Waterman Sales because he had not been

24 appointed yet. The Debtor's criticism of the Trustee for failing to timely file the WISI

25 Claim is so lacking in factual and legal support as to be virtually frivolous.

26 / / /

27 / / /

28 / / /

10

1  **Assignment of the Subordination Payments Did Not Exonerate the Debtor from its**
2  **Obligation to Reimburse Waterman Sales**.

3       This analysis begins by recognizing that Waterman Sales unquestionably has a

4  claim against the Debtor based on the statutory right of reimbursement under California

5  Civil Code § 2847 which states in pertinent part:

6       If a surety satisfies the principal obligation, or any part thereof, whether with or
         without legal proceedings, the principal is bound to reimburse what he has
7       disbursed, including necessary costs and expenses . . . .

8       Accordingly, in the absence of a showing otherwise, Waterman Sales is entitled to

9  reimbursement from the Debtor for the money that was taken from Waterman Sales to

10 pay the Wells Fargo Debt. The Debtor does not really attempt to challenge this issue. The

11 Debtor acknowledges that at least $965,000 of Waterman Sales' money was indeed used

12 to reduce the Wells Fargo Debt. The Debtor's argument challenges its obligation to pay

13 the WISI Claim based on a convoluted analysis of the Plan.

14       The Debtor acknowledges in its Claim Objection that the WISI Claim is an

15 "account" which was subject to Galena's security interest under the terms of the WISI

16 Guaranty and Security Agreements. The Debtor correctly points out that the

17 Subordination Clause operated to subordinate the WISI Claim to Galena's prior right to

18 receive payments on its Debt. The Debtor cites § 510(a), for the proposition that the

19 Subordination Clause is fully enforceable against Waterman Sales: "A subordination

20 agreement is enforceable in a case under this title to the same extent that such agreement

21 is enforceable under applicable nonbankruptcy law." However, the Subordination Clause

22 inured to the benefit of Galena, not the Debtor, and the Galena Debt has been fully

23 provided for in the Plan.

24       The Debtor then looks to the Plan which purports to assign the Subordination

25 Payments to the Debtor. Based thereon, the Debtor leaps to the conclusion that it is no

26 longer obligated to pay the WISI Claim. The Debtor contends that it holds the "right to

27 payment" of the Subordination Payments and that any money paid on the WISI Claim

28 would automatically revert directly back to the Debtor - a legal absurdity. The argument

11

1 here fails because the Debtor has misconstrued the nature and substance of the

2 Subordination Payments.

3    At the time the Plan was confirmed, and the Subordination Payments "assigned" to

4 the Debtor, Galena's right to collect Waterman Sales' accounts, ergo any right Galena

5 may have had to collect the WISI Claim, was nothing more than a security interest. The

6 WISI Guaranty and Security Agreements assigned Waterman Sales' accounts to Wells

7 Fargo *as security* for the Wells Fargo Debt. Neither Wells Fargo, nor Galena ever

8 foreclosed on that security interest; they never sought an adjudication of title or

9 ownership in Waterman Sales' accounts. Waterman Sales' accounts have at all times

10 remained the property of Waterman Sales. Galena's security interest in those accounts,

11 and the purported assignment of that security interest, did not divest Waterman Sales of

12 the accounts themselves. By creating and defining the term "Subordination Payments" in

13 the Plan, the Debtor has attempted to fabricate, out of whole cloth, an absolute "right to

14 payment" which never before existed independent of the underlying obligation embodied

15 in the Wells Fargo Debt instruments.

16    The Debtor states repeatedly, without supporting evidence or authority, that Galena

17 assigned the right to collect Waterman Sales' accounts - specifically the right to collect

18 the WISI Claim - back to the Debtor upon confirmation of the Plan. However, to

19 accomplish this Galena would also have had to assign to the Debtor a portion of the

20 underlying Galena Debt. Nothing in the Plan, the Disclosure Statement, or in any

21 documents offered in support of the Claim Objection, suggests that any portion of the

22 Galena Debt was assigned away to anybody.

23    The Disclosure Statement states that GNI Waterman would assume "all of the

24 Debtor's debt to Galena." (Disclosure Statement at pg. 20, ¶ H(1)(a).) This disclosure is

25 consistent with the fact that Galena still asserts a claim against Waterman Sales for the

26 full amount originally owed under the WISI Guaranty. Galena's Claim against Waterman

27 Sales has not been withdrawn or amended to reflect any reduction for debt purportedly

28 assigned to the Debtor. It would be absurd for this court to make a ruling which

effectively denies the Trustee the right to recover a debt owed to Waterman Sales, based on some contrived "assignment" of the Galena Debt, and which still leaves Waterman Sales' estate exposed to the full amount of Galena's Claim on the theory that Galena still holds the entire Galena Debt.[9]

The contradiction inherent in the Debtor's argument is patently apparent in the Debtor's amended Claim Objection wherein the Debtor makes the statements, "Galena assigned the right to receive these sums back to [Debtor] for distribution pursuant to the Plan" and that "payment on the WISI [Claim] . . . would only result in the funds being paid back to [Debtor] . . . ." (Amended Objection to Proof Of Claim No. 322 filed on June 13, 2006 at pg 6:16-23.)  These statements squarely contradict the Debtor's statement earlier in the same pleading that "[e]ven if there is an allowable [WISI Claim] . . . Galena would be entitled to the proceeds." *Id.* at pg. 5:19-21.

It is well established under California law that there can be no assignment of a security interest independent of the assignment of the underlying debt. *Wolfe v. Leisure Time Sports, Inc. (In re Leisure Time Sports, Inc.)*, 194 B.R. 859, 861 (9th Cir. BAP 1996)(citing *Union Supply Co. v. Morris*, 220 Cal. 331, 338-39, 30 P.2d 394, 397 (1934)). "A security interest cannot exist, much less be transferred, independent of the obligation which it secures." *Id.* (citation omitted).  A purported assignment of a security interest without an assignment of the debt which it secures is a "legal nullity." *Id.*

> This is not a mere technical legal requirement: To allow the assignee of a security interest to enforce the security agreement would expose the obligor to a double liability, since a holder in due course of the promissory note clearly is entitled to recover from the obligor. Furthermore, the definition of 'security interest' in Section 1-201(37), Uniform Commercial Code--an interest in personal property which secures payment of an obligation--indicates that a security interest cannot exist without a debt.

---

[9] The court is not attempting to adjudicate here any issues with regard to Galena's Claim vis-a-vie the Waterman Sales' estate.  If the Trustee contends that there is a basis for objecting to Galena's Claim, based on confirmation of the Plan, full or partial satisfaction, or any other theory, that battle will have to be fought through a claim objection in the Waterman Sales' case.

13

1 | *In re Leisure Time Sports, Inc.*, 194 B.R. at 861 (citations omitted).

2 |     The court in *In re Leisure Time Sports, Inc.*, further held that, "[t]he only

3 | consequence of the ineffective assignment . . . was that no rights were created in the

4 | assignee." Consequently, Galena's attempt to assign its security interest in the WISI

5 | Claim, the purported Subordination Payments, had no force or effect.

6 |     Assuming, arguendo, that assignment of the Subordination Payments did

7 | effectuate a partial assignment of the Galena Debt back to the Debtor, the Debtor was still

8 | a co-obligor with Waterman Sales on the assigned Debt. Under California law, the

9 | assignment of a joint and several debt to one of the co-obligors extinguishes that portion

10 | of the debt altogether. *Great Western Bank v. Kong*, 90 Cal.App.4th 28, 32 (2001)

11 | (citations omitted). Either way, whether the assignment of Subordination Payments was a

12 | legal nullity, or whether it operated to extinguish a portion of the underlying Galena Debt,

13 | the court cannot reach the conclusion that the Debtor no longer has an obligation to

14 | reimburse Waterman Sales. Confirmation of the Plan did not exonerate the Debtor from

15 | its liability to pay the WISI Claim.

16 | **The Disclosure Statement Failed to Comply With § 1125 and the Plan Failed to**
**Comply With § 1123(a) With Regard to the WISI Claim.**

17 |

18 |     The WISI Claim was filed as a general unsecured claim. As such, it would be

19 | entitled to treatment in Class 3-A along with all of the other unsecured claims. But the

20 | Debtor contends that the WISI Claim must be treated differently. The Debtor essentially

21 | tried to eliminate the WISI Claim by adding the "assignment of Subordination Payments"

22 | provision to Class 2-A, which provides for treatment of the Galena Debt. If the Debtor

23 | intended to treat the WISI Claim outside of Class 3-A, then that should have been

24 | candidly disclosed in the Disclosure Statement.

25 |     Section 1125(b) prohibited the Debtor from soliciting acceptance or rejection of

26 | the Plan unless the creditors received a Disclosure Statement with "adequate

27 | information." The term "adequate information" is defined in § 1125(a) to mean

28 | "information of a kind, and in sufficient detail . . . that would enable a hypothetical

1    reasonable investor typical of holders of claims . . . of the relevant class to make an
2    informed judgment about the plan."
3          Here, the Disclosure Statement fails to separately classify the WISI Claim and
4    contains virtually no information from which the Trustee could have made "an informed
5    judgment about the plan" as it is now defined by the Debtor. Quite the opposite, to the
6    extent that the Debtor argues for treatment of the WISI Claim outside of Class 3-A, the
7    Plan and Disclosure Statement are grossly misleading.
8          For the same reasons, the Plan fails to comply with § 1123(a) which provides for
9    the classification of claims. It states in pertinent part:
10         (a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall–
11             (1) designate, subject to section 1122 of this title, classes of claims, other than
       [priority claims] . . . and classes of interests;
12
13     . . .
             (3) specify the treatment of any class of claims or interests that is impaired
14     under the plan;
15             (4) provide the same treatment for each claim or interest of a particular class,
       unless the holder of a particular claim or interest agrees to a less favorable
16     treatment of such particular claim or interest.
17         Here, it is clear that the WISI Claim is impaired under the Plan because it is not
18   going to be paid in full upon approval of the Claim. Section 1122(a) prohibits the Debtor
19   from putting the WISI Claim in Class 3-A unless it is "substantially similar to the other
20   claims or interests of such class." However, the Debtor was required by § 1123(a) to
21   separately classify the WISI Claim if it was not going to receive "the same treatment" as
22   each other unsecured claim. Reading §§ 1122(a) and 1123(a) together, the WISI Claim
23   must be treated as a Class 3-A claim; Class 3-A is the only class in the Plan which could
24   provide for the WISI Claim. By deliberately failing to separately classify and provide for
25   the WISI Claim, the Debtor is now estopped from arguing that the WISI Claim is not
26   "substantially similar" to the other unsecured claims.
27   / / /
28   / / /

15

**The WISI Claim is Not a Contingent Claim.**

The Debtor argues that the WISI Claim should be disallowed because it is a "contingent" claim. Section 502(e)(1) provides in pertinent part:

> [T]he court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that–
>
> . . .
>
> (B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution. . . .

There are at least three reasons why this argument fails. First, the WISI Claim may still be unliquidated, but it is not "contingent" in the sense that some antecedent act or event must occur before Waterman Sales has a right to receive distributions on its Claim under Class 3-A of the Plan. Waterman Sales has already paid the money for which it seeks reimbursement. Section 502(e)(2) provides for the allowance of a reimbursement claim as follows:

> (2) A claim for reimbursement or contribution of such an entity that becomes fixed after the commencement of the case shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) of this section, the same as if such claim had become fixed before the date of the filing of the petition.

Waterman Sales is entitled to a prepetition claim in the amount that it has already paid to Wells Fargo. A guarantor's reimbursement claim is not contingent once it has paid on the guaranty. "The combined effect of section 502(e)(1)(B) and 502(e)(2) is that a surety or codebtor is generally permitted a claim for reimbursement or contribution *to the extent the surety or codebtor has paid the assured party at the time of allowance. . . .*" (Emphasis in original.) *In re Early & Daniel Industries, Inc.*, 104 B.R. 963, 969 (Bkrtcy.S.D.Ind. 1989)(citing, 124 Cong Rec H11094 (daily ed. Sept. 28, 1978); S17410-11 (daily ed. Oct. 6, 1978); remarks of Rep. Edwards and Sen. DeConcini; *reprinted in Norton* at 288.

Second, the underlying purpose of § 502(e)(1)(B) is not applicable here. The purpose and effect of § 502(e)(1)(B) has been described as follows:

16

Section 502(e)(1)(B) was enacted "to prevent . . . competition between a creditor and [its] guarantor for limited proceeds of the estate." H.R. Rep. No. 595, 95th Cong., 1st Sess. 354 (1977). Thus, section 502(e)(1)(B) is applicable to a debt owed by the debtor to a creditor which has been guaranteed by a third party. If the primary obligee seeks payment from its guarantor, the guarantor may seek reimbursement or contribution from the debtor. Both the primary obligee and the guarantor have a claim against the debtor that arises from the same debt; the primary obligee has a right to payment from the debtor, and the guarantor has a contingent right to reimbursement or contribution from the debtor which may become noncontingent in the event that it fully satisfies the primary obligee's claim. By disallowing the guarantor's contingent claim for reimbursement or contribution, section 502(e)(1)(B) insures that the estate will not be liable to the primary obligor and the guarantor for the same debt. *See Potter v. CNA Insurance Companies (In re Mei Diversified, Inc.)*, 106 F.3d 829 (8th Cir. 1997); *Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.)*, 993 F.2d 915 (1st Cir. 1993).

*4 Collier on Bankruptcy*, (15th Ed. Revised 2003), ¶ 502.06[2][d], pg. 502-62, 63 (some citations omitted).

Here, there is no competition between Galena and Waterman Sales for the "limited proceeds" of the Debtor's estate. The Plan designates exactly what assets will be liquidated to pay Galena. GNI Waterman assumed the remainder of the Galena Debt. The unsecured claims will be paid from a separate fund, the Plan Account. Galena made a $1.25 million payment to help fund the Plan Account. Galena has no "competing" rights against the Plan Account.

Third, any remaining contingency was removed upon confirmation of the Plan. The Plan establishes the Plan Account for the payment of unsecured claims. The unpaid Galena Debt has been either assumed by GNI Waterman, or provided for through the liquidation of designated assets. The Debtor has no other obligation to make payments to Galena which must be satisfied ahead of the WISI Claim.

The only arguable restriction on payment of the WISI Claim was the Subordination Clause. However, the Subordination Clause is now meaningless. The purpose of the Subordination Clause was essentially the same as the purpose ascribed above to § 502(e)(1)(B); to protect Galena's right to get paid from the Debtor's assets before the Debtor could use those assets to reimburse or pay any debt to Waterman Sales. Galena's rights against the Debtor's assets are now fixed in the Plan. Galena released its lien against all other assets. Galena has no rights against the Plan Account and the remaining

17

assets that have been designated for payment of the unsecured claims. Galena no longer holds any rights against the Debtor, or its assets, for the Subordination Clause to protect.

The Debtor cites to paragraph 6 of the WISI Guaranty which purports to waive any right of subrogation until the Galena Debt is paid in full. The Debtor argues that the Galena Debt will never be "paid in full" under the Plan. The argument is misplaced. The Galena Debt has been assumed by GNI Waterman. Galena owns GNI Waterman. It is unknown whether the Galena Debt will ever be literally "paid in full" under the Plan, but it is fully provided for under the Plan. After liquidation of the assets designated for payment of Galena, the Debtor's obligation to Galena will be fully satisfied. The Plan is binding on Galena. § 1141(a). The Plan's treatment of the Galena Debt is the functional equivalent of "full payment" with regard to any waivers contained in the WISI Guaranty.

Further, the WISI Claim is enforceable based on Waterman Sales' statutory right of *reimbursement*, not subrogation. Section 509(b) requires the trustee to elect between the subrogation and reimbursement remedies.[10] Although the Trustee initially asserted the WISI Claim based on the right of subrogation, he has apparently abandoned that theory

---

[10]Section 509 provides in pertinent part:

(a) Except as provided in subsection (b) or (c) of this section, an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment.
(b) Such entity is not subrogated to the rights of such creditor to the extent that–
        (1) a *claim of such entity for reimbursement* or contribution on account of such payment of such creditor's claim is–
            (A) allowed under section 502 of this title;

        . . .

(c) The court shall subordinate to the claim of a creditor and for the benefit of such creditor an allowed claim, by way of subrogation under this section, or for reimbursement or contribution, of an entity that is liable with the debtor on, or that has secured, such creditor's claim, until such creditor's claim is paid in full, either through payments under this title or otherwise. (Emphasis added.)

18

1    and elected instead, by his response to this Claim Objection, to assert the Claim for

2    reimbursement.

3    　　　Based thereon, the court finds and concludes that confirmation of the Plan

4    abrogated the Subordination Clause in the WISI Guaranty in so far as it might have any

5    affect on the WISI claim.  Upon confirmation of the Plan, any restriction or

6    "contingency" to payment of the WISI Claim terminated and § 502(e)(1)(B) has no

7    application.

8    **Final Comment - Equity and Fundamental Due Process.**

9    　　　Having explained above the factual and legal reasons why the court cannot sustain

10   the Debtor's Claim Objection, the court feels compelled to address the due process and

11   equitable issues that do not fit neatly within the prior discussion.  Looming like a "dark

12   cloud" over this contested matter are a number of questions which the Debtor has failed

13   to address with any kind of credible explanation.  Those questions include: Why did the

14   Debtor fail to schedule Waterman Sales as a creditor even though Waterman Sales had

15   guaranteed the Wells Fargo Debt?  Why did the Debtor's management fail to file a timely

16   proof of claim for Waterman Sales even though the Debtor had transferred almost $1

17   million of Waterman Sales' money to Wells Fargo?  Why did the Debtor fail to identify

18   and separately classify the $10 million WISI Claim in the Disclosure Statement and Plan

19   if the Debtor intended that the Claim would not be treated as it was filed, a general

20   unsecured claim?  Why did the Debtor instead fabricate the Subordination Payments as an

21   artifice for subsequent disallowance of the WISI Claim?  If the assignment of

22   Subordination Payments was intended to apply specifically to the WISI Claim, why did

23   the Plan vaguely describe the Subordination Payments as being applicable to unidentified

24   "persons or entities?"[11]  Did the Trustee have adequate notice of how the Plan was

25

26   _____

27   　　　[11]The record suggests that Waterman Sales is the only creditor affected by the
       assignment of Subordination Payments.  There are no other claim objections in which the
28   Debtor has asked to apply this provision to any other creditors.

supposed to treat the WISI Claim when that treatment was disguised as an "assignment of Subordination Payments" and buried deep within the paragraph of the Plan which provides for treatment of the Galena Debt? The Debtor argues that the Trustee failed to object to confirmation of the Plan, that the confirmed Plan is binding on the Trustee, and that the Trustee is barred by *res adjudicata* from questioning the Plan's treatment of the WISI Claim. But the Plan does not properly classify and provide for separate treatment of the WISI Claim. How much effort was the Trustee supposed to spend analyzing every term of the Plan trying to figure out what secret scheme was hidden within the Plan that he might need to object to? On the face of the Plan and the Disclosure Statement, the WISI Claim would appear to be entitled to treatment like any other general unsecured claim in Class 3-A. Did the Disclosure Statement and Plan, as defined now by the Debtor, give the Trustee adequate notice of the intended result, and satisfy the fundamental notions of due process with regard to a different treatment of the WISI Claim?[12]

The Trustee argues kindly that the Debtor and Galena, "put a great deal of thought into how they might structure a Plan that would destroy [Waterman Sales'] right to obtain reimbursement from [the Debtor] for payment made on the [Wells Fargo Debt]." After careful consideration of the Plan, and the arguments made by the Debtor in the subsequent Claim Objection, the court is inclined to agree with the Trustee. The Debtor and Galena were co-proponents of the Plan. Why didn't the Plan proponents disclose in plain, clear language what they were intending to do with the WISI Claim? The obscure

---

[12]The Supreme Court identified the due process requirements for notice in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657 (1950).

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information . . . . (citations omitted.)

device which they conceived in an effort to avoid the Debtor's legal liability to Waterman Sales is "disappointing" to say the very least. The "Subordination Payments" scheme borders on the realm of "dirty tricks." The bankruptcy court is a court of equity and the equities of this contested matter lie squarely with the Trustee. To the extent that the court has any discretion to interpret the Plan and rule on the Claim Objection, the Debtor has shown no reason why the court should rule in its favor on this issue.

**Conclusion.**

Based on the foregoing, the court finds and concludes that the WISI Claim was not untimely filed. The WISI Claim is enforceable against the Debtor based on Waterman Sales' statutory right of reimbursement. Confirmation of the Plan did not exonerate the Debtor from its obligation to Waterman Sales because the assignment of Subordination Payments was a nullity. Confirmation of the Plan abrogated the Subordination Clause in the WISI Guaranty because the Debtor has no further duty to make payments to Galena. Finally, the WISI Claim is not a contingent claim. Accordingly, the Debtor's Claim Objection will be overruled with regard to the issue of the Debtor's liability to pay the WISI Claim as a general unsecured claim pursuant to Class 3-A of the Plan. The court will set a further hearing and discovery schedule, if necessary, to liquidate the amount of the WISI Claim.

Dated: March  _3O_ , 2007

_____
W. Richard Lee, Judge
United States Bankruptcy Court

21

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF CALIFORNIA**

**CERTIFICATE OF MAILING**

The undersigned deputy clerk in the office of the United States Bankruptcy Court for the Eastern District of California hereby certifies that a copy of the document to which this certificate is attached was mailed today to the following entities listed at the address shown on the attached list or shown below.

Waterman Industries, Inc.
PO Box 3257
Clovis, CA 93613

Waterman Industries, Inc.
PO Box 458
Exeter, CA 93221

04-11065-B-11F
Waterman Industries, Inc.

Riley C. Walter
7110 N Fresno St #400
Fresno, CA 93720

James E. Salven
PO Box 25970
Fresno, CA 93720

Beth Maxwell Stratton
7415 N Palm Ave #101
Fresno, CA 93711

Mark L. Pope
Office of the U.S. Trustee
2500 Tulare St #1401
Fresno, CA 93721

**DATED:** March 30, 2007

**By:** _Diana D. Morales_
                **Deputy Clerk**

EDC 3-070 (New 4/21/00)